**CALCASIEU PAPER COMPANY, Inc., Appellant,**

v.

**CAMERON MACHINE COMPANY, Appellee.**

No. 15234.

United States Court of Appeals Fifth Circuit.

April 20, 1955.

Chester Bedell, C. Harris Dittmar, Bedell & Bedell, Jacksonville, Fla., of counsel, for appellant.

Edward S. Hemphill, Jacksonville, Fla., for appellee.

Before HUTCHESON, Chief Judge, TUTTLE, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

This was a suit for the unpaid portion of the price of a machine sold by appellee to appellant under an alleged contract consisting of correspondence between the two companies. After trial amendments and typographical and mathematical errors not pertinent here were corrected, the trial judge gave judgment for appellee in the amount for which it prayed. Although the evidence concerned other items of equipment and services, the matter here concerns only the cost of the machine and its ability to perform the tasks for which it was purchased.

Calcasieu Paper Company, Inc., (herein called Calcasieu) is a Louisiana corporation which owns and operates a large paper manufacturing plant at Elizabeth, Louisiana, but its principal office is located in Jacksonville, Florida. Its president, C. G. McGehee, resides in Jacksonville and personally conducts most of its business affairs, particularly major purchases of equipment.

Early in 1950, Calcasieu completed the construction of a new plant at Elizabeth and discovered that the rewinding machine designed therefor would not perform efficiently, being unable to keep up with the quantity of paper produced. This situation was reported to McGehee, who undertook to purchase a suitable machine ready for delivery.

Because he considered its machines preferable to others, McGehee placed a long distance telephone call to Cameron Machine Company (herein called Cameron) in Brooklyn about the middle of May, 1950, and discussed the problem with Eugene J. Ward, vice president in charge of sales with Cameron. He was told that manufacture of a custom built machine would require several months but that Cameron had two machines in Canada awaiting shipment to Australia, one of which might be diverted to Calcasieu and adapted to the latter's needs. According to McGehee's testimony,[1] there was discussion about the adaptability of the machine for Calcasieu's use, and Ward was directed to an engineering firm which had designed the plant at Elizabeth. When asked the price of the machine, Ward replied, "About $23,000." After consultation with the engineering firm, Ward called McGehee in Jacksonville, with the information that the machine could be adapted to Calcasieu's needs, but the work involved in doing so would require an increase in his estimate of price to "approximately $28,000" plus import duty which Ward thought was about fifteen percent. McGehee replied:

"That will be all right. You proceed immediately to get the machine from Canada to Brooklyn, [where it was originally intended the modifications would be made] and will you mail, to Calcasieu Paper Company, today, and address a letter to them, care of Bentley Hotel at Alexandria, Louisiana, air mail, so they will get it immediately * * *. I want them to get the information immediately so they can decide what to do in the way of foundations, etc., for installation of the machine when it gets down there."

Following this conversation Cameron addressed a letter as requested, dated May 18, 1950, in which a full summary of the specifications of the machine was set out. The letter was termed a proposal and contained a paragraph setting forth the price as $33,315.00, to include specified accessories. The letter also offered to furnish the services of a skilled person to install the machine and instruct the operators, to be furnished at cost, and closed with this statement: "We look forward to the privilege of filling your requirements." By letter dated May 20, 1950, the general manager of Calcasieu's plant wrote to Cameron, beginning with the statement: "We have your letter of May 18 regarding winder located in Canada which you *offer* for immediate shipment." (Emphasis supplied.) This letter dealt with questions the plant operators had concerning the specifications of the machine and the accessories to be furnished. The inquiries there made were answered by Cameron in a letter dated May 26, 1950. Subsequently the machine was shipped to Elizabeth, installed under the supervision of one of Cameron's employees and, after considerable difficulties in adapting it to Calcasieu's needs, operated as required. No mention was made of the price of the machine until several months after delivery, when McGehee began to contend that the price was fixed

1. Ward did not testify specifically as to the telephone conversations, since Cameron was relying upon the correspondence between the companies to prove the contract. Hence, for the content of the conversations, we are bound to rely upon McGehee's uncontradicted testimony.

at $28,000 plus duty in the telephone conversations. This contention gave rise to extensive correspondence between the two companies, as a result of which corrections were made as to certain items of equipment invoiced to Calcasieu. It appears from this correspondence that ultimately Cameron's corrected invoice price was $32,970, whereas Calcasieu continued its position that the price should be $28,000 plus duty, not to exceed $32,000. Eventually, Calcasieu paid $25,000 and this suit was entered for the balance of the account.

At the trial, Calcasieu urged its contention that the price was established in the telephone conversations between McGehee and Ward, and that the subsequent correspondence amounted in law only to proposals by Cameron to amend the oral contract, which were never accepted. Further, it contended that it was entitled to an off-set against the price on account of defective latches which allowed rewind shafts to be thrown to the floor and damaged to the extent that their replacement was necessary. It also sought an allowance for the services of its employees who assisted Cameron's service man in installing and adapting the machine which, it argued, should have been done in Brooklyn pursuant to the original agreement.

The trial judge found that the contract between the parties consisted of Cameron's proposal (letter of May 18, 1950), Calcasieu's reply (of May 20) and Cameron's reply (of May 26); that the several telephone conversations between McGehee and Ward were only preliminary negotiations which were merged into the written contract. As to Calcasieu's claim for credit for the price of the two rewind shafts, the court held that the preponderance of the evidence lay with Cameron.

■ Here, Calcasieu reurges its contention that the telephone conversations, proven by the uncontradicted testimony of McGehee, constituted the completed contract and that the trial court's finding to the contrary is clearly erroneous.

More or less in the alternative, it urges that the evidence showed a failure of substantial performance on the part of Cameron which breached the contract; that Cameron is therefore entitled to recover only the actual value of the machine, which does not exceed the $25,000 previously paid.

The error of Calcasieu's contention lies in its failure to distinguish between the discussions actually had in the telephone conversations and McGehee's conclusions therefrom. It is clear from McGehee's testimony, when considered in connection with the subsequent correspondence between the parties, that the prices mentioned during the conversations were only estimates, not intended to be a firm offer. We think the trial judge was correct in interpreting those conversations as mere preliminary negotiations and in concluding that the contract consisted of the correspondence resulting therefrom.

■ There was evidence to the effect that defects in the latches caused the rewind shafts to be thrown to the floor when the machine was in operation at high speed. However, there is also evidence tending to show that these latches were standard equipment at the time the machine was delivered and that the rewind shafts had become damaged and unusable because of improper handling by Calcasieu's employees. There being this conflict in the evidence, we cannot say that the trial judge's finding in favor of Cameron's contention is clearly erroneous.

Calcasieu may very well have been able to recoup whatever it had expended in assisting Cameron's employee to make the modifications required by the contract. However, it offered no evidence upon which an award for such claim could be based.

It appearing that the findings and conclusions of the trial judge were not clearly erroneous, the judgment is

Affirmed.